UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **William A. Jacobson**, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>**Mary T. Bassett**, in her official capacity as Acting Commissioner of the New York Department of Health,<br><br>    Defendant. | Case No. 3:22-cv-00033-MAD-ML |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of contents ................................................................................................. i

Table of authorities ............................................................................................ ii

Introduction ...................................................................................................... 1

Background ........................................................................................................ 2

    I.   The COVID-19 pandemic ......................................................................... 2

    II.  The state's restrictions of COVID-19 oral antiviral treatments by race ......... 3

    III. The plaintiff's exclusion of treatment on the basis of race ........................... 5

Argument ........................................................................................................... 6

    I.   Plaintiff is likely to prevail on the merits ................................................. 6

        A. The treatment policy violates the Equal Protection Clause ..................... 6

        B. The treatment policy violates Title VI of the Civil Rights Act ................. 8

        C.  The treatment policy violates section 1557 of the Affordable Care Act .......................................................................................................... 9

    II.  Plaintiff satisfies the remaining preliminary-injunction criteria ..................... 9

Conclusion ....................................................................................................... 12

Certificate of service .......................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (2000) ................................... 6, 7

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) ........................ 9, 11

*Association for Fairness in Business Inc. v. New Jersey*,
  82 F. Supp. 2d 353 (D.N.J. 2000) ................................................................... 10

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ..................................... 7

*Cortez III Service Corp. v. Nat'l Aeronautics & Space Admin.*,
  950 F. Supp. 357 (D.D.C. 1996) ...................................................................... 10

*Crowley v. Local No. 82, Furniture & Piano Moving*,
  679 F.2d 978 (1st Cir. 1982) ........................................................................... 11

*Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013) ..................................... 6, 7

*Francois v. Our Lady of the Lake Hosp., Inc.*,
  8 F.4th 370 (5th Cir. 2021) ................................................................................ 9

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ........................................................ 9

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ...................... 2

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ............................................. 11

*Miller v. Johnson*, 515 U.S. 900 (1995) ............................................................. 6, 7

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of
  Jacksonville*, 508 U.S. 656 (1993) .................................................................. 10

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................. 11

*O'Donnell Construction Co. v. District of Columbia*,
  963 F.2d 420 (D.C. Cir. 1992) ......................................................................... 10

*Parents Involved in Community Schools v. Seattle School District No. 1*,
  551 U.S. 701 (2007) ........................................................................................... 8

*Rice v. Cayetano*, 528 U.S. 495 (2000) ................................................................. 8

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .................................................... 6

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) .................................................... 9

*Westfield High School L.I.F.E. Club v. City of Westfield*,
  249 F. Supp. 2d 98 (D. Mass. 2003) ................................................................ 11

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) ........................................... 8

**Statutes**

42 U.S.C. § 2000d ................................................................................................... 8

42 U.S.C. § 2000d-4a .............................................................................................. 8

42 U.S.C. § 18116 ................................................................ 9

**Rules**

Fed. R. Civ. P. 65(c) ........................................................... 11

**Other Authorities**

Shirin Ali, *New Study Finds Omicron Variant Better at Evading Immunity*, The Hill (Jan. 3, 2022), https://bit.ly/3I9yXvD ........................... 2

Aaron Blake, *'Most People Are Going to Get Covid': A Momentous Warning at a Senate Hearing*, Washington Post (Jan. 11, 2022), https://wapo.st/3fqyxVt ........................... 3

Lexi Lonas, *Fauci: Omicron Will Infect 'Just About Everybody'*, The Hill, (Jan. 12, 2022), https://bit.ly/322TOBo ........................... 3

Jeremy Olson, *Minnesota Removes Race as Factor in Rationing COVID-19 Antibody Treatment*, The Star Tribune, (Jan. 13, 2022), http://strib.mn/3tw9DvG ........................... 5

*UDOH Announces Changes to Risk Assessment Process for Accessing Scarce COVID-19 Treatments*, Utah Dep't of Health (Jan. 21, 2022), https://bit.ly/3HqVVP0 ........................... 5

## INTRODUCTION

The New York Department of Health recently announced that it will give automatic priority to "non-white" and "Hispanic/Latino" individuals in distributing life-saving COVID-19 treatments. Under the Department's policy (the "Treatment Policy"), non-Hispanic whites who test positive for COVID-19 are ineligible for oral antiviral treatments unless they demonstrate "a medical condition or other factors that increase their risk for severe illness." But non-whites and Hispanics/Latinos who test positive for COVID-19 are automatically eligible for these life-saving antiviral treatments—regardless of the individual's medical situation—because the Department has proclaimed that one's status as a racial or ethnic minority is itself a "risk factor" for severe illness from COVID-19, even if the individual has no medical condition that would make him more susceptible to harm from COVID-19. In the words of the Department: "Non-white race or Hispanic/Latino ethnicity should be considered a risk factor, as longstanding systemic health and social inequities have contributed to an increased risk of severe illness and death from COVID-19."

The Department's explicit racial preferences in the distribution of COVID-19 treatments are patently unconstitutional and should be immediately enjoined. Using a patient's skin color or ethnicity as a basis for deciding who should obtain lifesaving medical treatment is appalling. And directing medical professionals to award or deny medical care based on immutable characteristics such as skin color, without regard to the actual health condition of the individual who is seeking these treatments, is nothing more than an attempt to establish a racial hierarchy in the provision of life-saving medicine. Worse still, the Department ignores the obvious race-neutral alternative policy of making antiviral treatments available to patients of any race who can demonstrate risk factors such as advanced age, obesity, a compromised immune system, or other medical conditions. The Treatment Policy violates the Constitution and multiple federal statutes, and Plaintiff is not just likely but certain to prevail on the merits.

The other preliminary injunction factors—irreparable injury, the balance of equities, and the public interest—also favor enjoining the Department's racial classifications. Courts have held repeatedly that plaintiffs suffer irreparable harm when they lose access to a valuable benefit or are forced to compete under more onerous terms because of a racial classification. And the balance of equities is not close. The Department cannot plausibly contend that it will be injured if it is enjoined from enforcing the express racial preferences in the Treatment Policy. Even without those preferences, the Department can continue allocating antiviral drugs to *all patients*—regardless of race—based on objective medical risk factors that identify the patients most in need of these lifesaving treatments. Finally, courts have repeatedly held that there is always a strong public interest in enjoining unconstitutional and unlawful government actions. This Court should grant the motion for preliminary injunctive relief and order the Department to get out of the "sordid business [of] divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part and dissenting in part).

## BACKGROUND

### I. THE COVID-19 PANDEMIC

The impact of the coronavirus is well-known. Since March 2020, the virus has infected tens of millions of people and killed nearly 900,000 Americans. *COVID Data Tracker*, Centers for Disease Control & Prevention, https://bit.ly/3J4SWfB (accessed on Feb. 4, 2022). In late November 2021, the World Health Organization announced the discovery of the highly contagious "Omicron" variant. World Health Organization, *Update on Omicron*, (Nov. 28, 2021), https://bit.ly/3ftaViX. Omicron is far more contagious than other strains of COVID and can evade the immunity provided by prior infection or vaccination. Shirin Ali, *New Study Finds Omicron Variant Better at Evading Immunity*, The Hill (Jan. 3, 2022), https://bit.ly/3I9yXvD.

Almost no one will be spared from contracting COVID-19. As the FDA Commissioner recently testified, "most people are going to get covid." Aaron Blake, *'Most People Are Going to Get Covid': A Momentous Warning at a Senate Hearing*, Washington Post (Jan. 11, 2022), https://wapo.st/3fqyxVt; *see also* Lexi Lonas, *Fauci: Omicron Will Infect 'Just About Everybody'*, The Hill, (Jan. 12, 2022), https://bit.ly/322TOBo. As of February 4, 2022, there have been more than 75 million reported cases of COVID-19 in the United States. *COVID Data Tracker*, *supra*. In the past seven days alone, nearly *three million* people in the United States have contracted COVID-19. *Id*. New York State and Tompkins County (where Plaintiff resides) are no exception. New York has been averaging more than 50,000 new COVID cases per day in the last week, and Tompkins County, with a population of just over 100,000, has been averaging more than 600 cases per day. *Id*.

## II.   THE STATE'S RESTRICTIONS OF COVID-19 ORAL ANTIVIRAL TREATMENTS BY RACE

In late December 2021, the Food and Drug Administration gave emergency-use authorization for two COVID-19 oral antiviral therapies, Paxlovid and molnupiravir. *Coronavirus (COVID-19) Update: FDA Authorizes First Oral Antiviral for Treatment of COVID-19*, U.S. Food & Drug (Dec. 22, 2021), https://bit.ly/3gm2TJg; *Coronavirus (COVID-19) Update: FDA Authorizes Additional Oral Antiviral for Treatment of COVID-19 in Certain Adults*, U.S. Food & Drug (Dec. 23, 2021), https://bit.ly/35LUXik

On December 27, 2021, the New York Department of Health issued a memorandum to healthcare providers and healthcare facilities entitled "COVID-19 Oral Antiviral Treatments Authorized and Severe Shortage of Oral Antiviral and Monoclonal Antibody Treatment Products." *See* Dkt. 1-1 ("Treatment Policy"). The Department announced that Paxlovid and molnupiravir had received Emergency Use Au-

thorization from the U.S. Food and Drug Administration and that these antiviral ther-apies significantly reduce the risk of hospitalization and death from COVID-19. *Id.* at 1–2.  Importantly, "[t]reatment is most effective when given as soon as possible and no more than 5 days after symptom onset." *Id.* at 3.

The Department warned, however, that "[w]hile the availability of oral antivirals for treatment of COVID-19 is an important milestone, it comes at a time of a signif-icant surge in cases and reduced effectiveness of existing therapeutics due to the omi-cron variant, which is now the predominant variant nationally and estimated by the [CDC] to account for over 90% of cases in New York." *Id.* at 1. Accordingly, New York is facing a "severe shortage of oral antiviral and monoclonal antibody treatment products." *Id.*

Given these "severe resource limitations," the Department instructed health-care providers and health-care facilities to "prioritize treatment for patients at highest risk for severe COVID-19 until more product becomes available." *Id.* at 2. The memo-randum then defines a patient's "eligibility" for these oral antiviral treatments. *Id.* Under the new policy, oral antiviral treatments are authorized only "for patients who meet all the following criteria":

- Age 12 years and older weighing at least 40 kg (88 pounds) for Paxlovid, or 18 years and older for molnupiravir
- Test positive for SARS-CoV-2 on a nucleic acid amplification test or antigen test; results from an FDA-authorized home-test kit should be validated through video or photo but, if not possible, patient attestation is adequate
- Have mild to moderate COVID-19 symptoms
  - Patient cannot be hospitalized due to severe or critical COVID-19
- Able to start treatment within 5 days of symptom onset
- *Have a medical condition or other factors* that increase their risk for severe illness.

- o *Non-white race or Hispanic/Latino ethnicity should be considered a risk factor*, as longstanding systemic health and social inequities have contributed to an increased risk of severe illness and death from COVID-19

*Id*. (emphasis added). The memorandum directs health-care providers and facilities in New York to "adhere" to the Department's "prioritization" instructions because of the "severe shortage of oral antiviral and monoclonal antibody treatment products." *Id*. at 1.

Thus, under the Policy, there is a racial hierarchy in the distribution of lifesaving COVID-19 medication. Non-whites and Hispanics/Latinos who test positive for COVID-19 automatically qualify for oral antiviral treatments, while identically situated non-Hispanic whites are ineligible unless they demonstrate a "medical condition" or "risk factor" that increases their risk for severe illness. For example, a healthy 25-year-old African American would be automatically eligible for these treatments while a similarly healthy 62-year-old white person would be ineligible for the treatment.

Other states that initially adopted race-based policies similar to New York's have quickly rescinded them. *See* Jeremy Olson, *Minnesota Removes Race as Factor in Rationing COVID-19 Antibody Treatment*, The Star Tribune, (Jan. 13, 2022), http://strib.mn/3tw9DvG; *UDOH Announces Changes to Risk Assessment Process for Accessing Scarce COVID-19 Treatments*, Utah Dep't of Health (Jan. 21, 2022), https://bit.ly/3HqVVP0. Yet New York continues to forge ahead with its plan to ration life-saving treatments by race.

## III.  THE PLAINTIFF'S EXCLUSION OF TREATMENT ON THE BASIS OF RACE

Plaintiff William Jacobson is a citizen and resident of Tompkins County, New York. Jacobson Decl. ¶1. Plaintiff is of East European ancestry. Jacobson Decl. ¶3. Under the Treatment Policy, he is not "non-white" and not "Hispanic/Latino." Jacobson Decl. ¶3.  Like all residents of New York at a time when the Omicron variant

is surging, Plaintiff is likely to contract COVID-19. *Supra* at 2-3; Jacobson Decl. ¶¶4-7. Plaintiff is especially at risk for contracting COVID-19 because he teaches at Cornell University, which recently had a severe outbreak despite its extensive COVID protocols (including a 97% vaccination rate among the campus community and compulsory indoor mask wearing). Jacobson Decl. ¶4; *see* Anil Oza, *How the Omicron Variant and the End of the Semester Created a 'Perfect Storm' for Cornell's COVID Outbreak*, The Cornell Sun, (Dec. 17, 2021), https://bit.ly/32a0sGc.

## ARGUMENT

To receive a preliminary injunction, a plaintiff must show (1) "a likelihood of success on the merits"; (2) that he is "likely to suffer irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in [his] favor"; and (4) that "the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (cleaned up). Plaintiff satisfies all four requirements.

## I.   PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

### A.   The Treatment Policy Violates The Equal Protection Clause

The Equal Protection Clause prohibits a state government from "deny[ing] to any person within its jurisdiction the equal protection of the laws." The "central mandate" of equal protection is "racial neutrality" by the government. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "Whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229–30 (2000). "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 309 (2013) (cleaned up).

"[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. Strict scrutiny is a "searching examination, and it is the government that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher*, 570 U.S. at 310 (cleaned up). Under strict scrutiny, "the government has the burden of proving that racial classifications are 'narrowly tailored measures that further compelling governmental interests.'" *Johnson*, 543 U.S. at 505.

The Treatment Policy is subject to strict scrutiny because it employs explicit racial classifications in determining eligibility for COVID-19 treatments. Under the Policy, non-whites and Hispanic/Latinos who test positive for COVID-19 automatically qualify for oral antiviral treatments, while identically situated non-Hispanic/Latino whites are ineligible unless they demonstrate a "medical condition" or "risk factor" that increases their risk for severe illness. Treatment Policy at 2. The Policy thus includes an express racial classification and may be found constitutional only if it can withstand strict scrutiny. *See Johnson*, 543 U.S. at 505.

The Department cannot satisfy this heavy burden. First, the Department cannot show a compelling interest for allocating COVID-19 treatments on the basis of race. The Department justifies its Policy as remedying "longstanding systemic health and societal inequities." Treatment Policy at 2. But a "generalized assertion that there has been past discrimination" cannot serve as a compelling interest for present racial classifications. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989). For the governmental interest "in remedying past discrimination to be triggered, 'judicial, legislative, or administrative findings of constitutional or statutory violations' must be made." *Id*. "Only then does the government have a compelling interest in favoring one race over another." *Id*. The Department has made no such findings here.

Second, the Policy is not narrowly tailored to any government interest in ensuring that scarce antiviral drugs are distributed to those who need them the most. There is no evidence that the Department ever "considered methods other than explicit racial classifications to achieve [its] stated goals." *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 704 (2007). Nor can the Department show "the most exact connection between [its] justification and classification." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986).

The Policy fails any conceivable level of tailoring analysis because there are obvious race-neutral alternatives that the Department failed to pursue. Most obviously, the Department could have established objective medical criteria or risk factors for *all* patients regardless of race to determine eligibility for antiviral drugs. For example, it is well-established that advanced age, obesity, a weakened immune system, and several other chronic medical conditions such as cancer or lung disease increase the risk of serious illness or hospitalization from COVID-19. By applying the same neutral, objective medical criteria to all patients, the Department could accomplish its goals of reserving treatment for the most at-risk patients without employing the "odious," *Rice v. Cayetano*, 528 U.S. 495, 517 (2000), and "highly suspect tool" of racial classifications, *Croson*, 488 U.S. at 493.

### B.    The Treatment Policy Violates Title VI Of The Civil Rights Act

Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The Department receives federal financial assistance, *see* New York State Division of the Budget, *Health, Department of*, https://on.ny.gov/3fsjgmY, and so is subject to Title VI's prohibitions, *see* 42 U.S.C. § 2000d-4a. The Department is violating the clear and unambiguous

text of Title VI by discriminating on account of race, and the Court should immediately enjoin it from enforcing or implementing these patently unlawful racial classifications.

### C.    The Treatment Policy Violates Section 1557 Of The Affordable Care Act

Section 1557 of the Affordable Care Act "prohibits discrimination based on any of the grounds protected under Title VI . . . , during the provision of health care." *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 377 (5th Cir. 2021); *see* 42 U.S.C. §18116 ("[A]n individual shall not, on the ground prohibited under title VI of the Civil Rights Act . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.") (citing 42 U.S.C. § 18116). Because the Treatment Policy discriminates based on race in violation of Title VI, the policy also violates section 1557.

## II.    PLAINTIFF SATISFIES THE REMAINING PRELIMINARY-INJUNCTION CRITERIA

***Irreparable Harm.*** A "'presumption of irreparable injury flows from a violation of constitutional rights.'" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)). Without an injunction, Plaintiff and his fellow class members will be subjected to racial discrimination under the Equal Protection Clause and federal civil rights law, which is classic irreparable harm.

Moreover, courts have repeatedly held that a plaintiff suffers irreparable harm when he is denied access to a valuable benefit, or forced to compete under more onerous terms, because of his race. *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 365 (6th Cir. 2021) (finding irreparable harm where the government was "allocat[ing]

limited coronavirus relief funds based on the race and sex of the applicants"); *Association for Fairness in Business Inc. v. New Jersey*, 82 F. Supp. 2d 353, 363 (D.N.J. 2000) (finding irreparable injury and entering a preliminary injunction where the plaintiffs were forced to "compete on an unfair playing field" as a result of a racial set-aside program); *O'Donnell Construction Co. v. District of Columbia*, 963 F.2d 420, 428 (D.C. Cir. 1992) (finding irreparable injury where "non-minority firms [were] ineligible to compete" for certain government contracts); *Cortez III Service Corp. v. Nat'l Aeronautics & Space Admin.*, 950 F. Supp. 357, 363 & n.5 (D.D.C. 1996) (finding irreparable injury because, without a preliminary injunction, the plaintiff would be "excluded from competing" for a contract because of the challenged "set-aside process"). And those cases found irreparable harm when the plaintiffs were denied access to mere *economic* benefits — such as economic aid, government contracts, or school admissions — because of their race. It follows *a fortiori* that irreparable harm exists when a plaintiff class is subjected to a racial disadvantage in the provision of lifesaving medical treatment while a pandemic is raging.

Neither Plaintiff nor his fellow class members need to prove that they would actually receive the antiviral drugs under race-neutral criteria; they need only to establish that they face an obstacle to receiving those drugs because of their race. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish [injury-in-fact]." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). The injury "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*

**Balance of Harms and the Public Interest**. The balance of the equities and the public interest factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors weigh in favor of injunctive relief because it is "'always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

Indeed, "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am.*, 983 F.3d at 636. That is precisely the case here: if the Court enjoins the racial preferences in the Treatment Policy, it will merely ensure that *all patients*, regardless of race, are eligible for critical antiviral drugs based on neutral, objective criteria regarding their medical risk factors. Plaintiff and his fellow class members have a powerful interest in not facing discrimination on account of their race, while the Department has no cognizable interest in allocating treatment based on race when such decisions could readily be made based on non-racial medical factors.[1]

---

1. The court should not require a bond. Courts have "recognized an exception to the security bond requirement in Fed. R. Civ. P. 65(c) in 'suits to enforce important rights or public interests.'" *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 128 (D. Mass. 2003) (quoting *Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978, 1000 (1st Cir. 1982)). Waiving the bond requirement is particularly appropriate here because Plaintiff is likely to succeed on the merits and the defendant will incur no "harm, financial or otherwise" by an injunction that stops the Department from violating the Constitution. *Id.*

## CONCLUSION

The Court should grant the plaintiff's motion and preliminarily enjoin the defendant from enforcing the racial preferences in the Treatment Policy.

Respectfully submitted.

*/s/* Jonathan F. Mitchell

GENE P. HAMILTON*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL*
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

ADAM K. MORTARA*
Illinois Bar No. 6282005
Lawfair LLC
125 South Wacker Drive, Suite 300
Chicago, Illinois 60606
(773) 750-7154
adam@mortaralaw.com

JEFFREY HARRIS*
MICHAEL CONNOLLY*
JAMES HASSON*
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
(703) 243-9423
Arlington, Virginia 22209
jeff@consovoymccarthy.com
mike@consovoymccarthy.com
james@consovoymccarthy.com

JAMES P. TRAINOR
New York Bar No. 505767
Trainor Law PLLC
2452 U.S. Route 9
Malta, New York 12020
518-899-9200 (phone)
518-899-9300 (fax)
jamest@trainor-lawfirm.com

\* admitted *pro hac vice* or
*pro hac vice* application pending

*Counsel for Plaintiff and
the Proposed Class*

Dated: February 4, 2022

## CERTIFICATE OF SERVICE

I certify that on February 4, 2022, I electronically filed this document with the clerk of court using the CM/ECF System, which will automatically send e-mail notification to all counsel of record.

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff and*
*the Proposed Class*