**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

WILLIAM A. JACOBSON, on behalf of himself
and others similarly situated,

                          *Plaintiff,*

     v.

MARY T. BASSETT, in her official capacity as
Acting Commissioner of the New York Depart-
ment of Health,

                        *Defendant.*

Case No. 3:22-cv-00033-MAD-ML

**PLAINTIFF'S COMBINED REPLY BRIEF IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION
AND OPPOSITION TO MOTION TO DISMISS**

## TABLE OF CONTENTS

I.      Plaintiff will likely prevail on the merits............................................................................ 1

        A.      Plaintiff's challenge to the Policy is not moot. ............................................... 1

        B.      Plaintiff likely has Article III standing. ............................................................ 2

        C.      The Department cannot avoid an injunction by promising not to enforce
                the Policy. ............................................................................................................. 6

        D.      The Policy likely violates the Fourteenth Amendment .................................. 7

        E.      The Policy likely violates Title VI and the ACA............................................. 9

II.     Plaintiff satisfies the remaining preliminary-injunction criteria.................................... 9

III.    The Department's motion to dismiss should be denied. ............................................. 10

        CONCLUSION ........................................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (2000) ................................................................................................ 7

*Baldwin v. Morgan,*
  287 F.2d 750 (5th Cir. 1961) ................................................................................. 6

*Barrett v. Maciol,*
  2022 WL 130878 (N.D.N.Y. Jan. 14, 2022) ...................................................... 9

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003) ............................................................................. 4, 5

*Chafin v. Chafin,*
  568 U.S. 165 (2013) ................................................................................................ 1

*Christa McAuliffe v. DeBlasio,*
  364 F. Supp. 3d 253 (S.D.N.Y. 2019) ................................................................ 7

*City of Mesquite v. Aladdin's Castle, Inc.,*
  455 U.S. 283 (1982) ................................................................................................ 2

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989) ................................................................................................ 8

*Comer v. Cisneros,*
  37 F.3d 775 (2d Cir. 1994) .................................................................................... 3

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008) ................................................................................................ 3

*Estle v. IBM Corp.,*
  23 F.4th 210 (2d Cir. 2022) ............................................................................... 10

*Fin. Guar. Ins. Co v. Putnam Advisory Co., LLC,*
  783 F.3d 395 (2d Cir. 2015) .............................................................................. 10

*Fisher v. Univ. of Tex. at Austin,*
  570 U.S. 297 (2013) ................................................................................................ 8

*Gratz v. Bollinger,*
  539 U.S. 244 (2003) ................................................................................................ 8

*Hedges v. Obama,*
  724 F.3d 170 (2d Cir. 2013) ................................................................................. 7

*Johnson v. California,*
543 U.S. 499 (2005) ................................................................................................. 8

*Jones v. Coleman,*
2017 WL 1397212 (M.D. Tenn. Apr. 19, 2017) ...................................................... 7

*Lewis v. Greyhound Corp.,*
199 F. Supp. 210 (M.D. Ala. 1961) ......................................................................... 6

*Malam v. Adduci,*
452 F. Supp. 3d 643 (E.D. Mich. 2020) ................................................................ 10

*Martinez v. Malloy,*
350 F. Supp. 3d 74 (D. Conn. 2018) ........................................................................ 4

*Meghrig v. KFC Western, Inc.,*
516 U.S. 479 (1996) ................................................................................................. 2

*Mhany Mgmt., Inc. v. Cty. of Nassau,*
819 F.3d 581 (2d Cir. 2016) ..................................................................................... 2

*Miller v. Johnson,*
515 U.S. 900 (1995) ................................................................................................. 9

*Ne. Fla. Chapter of Ass. Gen. Contractors v. City of Jacksonville,*
508 U.S. 656 (1993) ........................................................................................... 3, 4, 5

*Parents Involved in Community Schools v. Seattle School District No. 1,*
551 U.S. 701 (2007) ................................................................................................. 8

*Reliant Transportation, Inc. v. Div. 1181 Amalgamated Transit Union,*
2019 WL 6050345 (E.D.N.Y. Nov. 14, 2019) ......................................................... 5

*Shaw v. Hunt,*
517 U.S. 899 (1996) ................................................................................................. 8

*Speech First v. Fenves,*
979 F.3d 319 (5th Cir. 2020) .................................................................................... 2

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ................................................................................................. 4

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) ............................................................................................. 6

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
137 S. Ct. 2012 (2017) ............................................................................................. 2

*Vitolo v. Guzman,*
   999 F.3d 353 (6th Cir. 2021)............................................................................................2, 6, 8

**Statutes**

N.Y. Pub. Health Law §12(1).............................................................................................. 7

**Other Authorities**

N.Y. Executive Order 11.3, (Feb. 14, 2022), https://on.ny.gov/33DDmZh......................................... 4

Scott Hensley, *First Doses of Pavloxid, Pfizer's New COVID Pill, Are Released to States*, NPR, (Dec. 23, 2021), https://n.pr/3LSDGo0 ............................................................................................... 9

The Department's opposition confirms that the Policy's racial classifications are unconstitutional. The Department cannot show a compelling interest in enacting racial classifications because it identifies no specific evidence of state-sponsored discrimination, and the Policy is not narrowly tailored because the Department *never even evaluated* whether a workable race-neutral alternative exists.

The Department thus desperately tries to avoid the merits of this dispute. The Department argues that Plaintiff's claims are moot because there is no longer a shortage of antivirals. But the Department has never withdrawn the Policy and it concedes that a new shortage could occur at any moment. The Department contends that the Policy is "simply a suggestion" about how to prioritize treatment. But the Policy itself orders providers to "adhere" to its prioritization instructions and never suggests that it is merely advisory or voluntary. The Department also asserts that Plaintiff lacks standing because he doesn't have COVID-19 yet. But the Department never disputes the strong likelihood that Plaintiff will contract COVID-19, and the Second Circuit has rejected similar arguments that would insulate government actions from judicial review. The Court should grant Plaintiff's motion.

## I.     Plaintiff will likely prevail on the merits.

### A.     Plaintiff's challenge to the Policy is not moot.

The Department argues that Plaintiff's claims are moot because the Policy "address[es] a situation in which there is an antiviral therapy supply shortage" and "[t]here is no longer a shortage of antiviral therapies." Opp. 17. This argument fails for at least two reasons.

*First*, the Policy is still in effect and operational. The Department has not withdrawn the Policy or issued any new memorandum adopting new criteria for antiviral eligibility. To the contrary, the Department "continue[s] to vigorously" defend the Policy. *Chafin v. Chafin*, 568 U.S. 165, 173 (2013). The Department has merely removed the Policy from its website. Opp. 7. Because the Policy is still in effect, providers must continue to "adhere" to the Department's prioritization instructions, Heslin Decl.,  Ex. A ("Policy") at 1-2, and so Plaintiff's challenge to the Policy is not moot.

1

*Second*, even if the Department withdraws the Policy, this voluntary cessation will not moot Plaintiff's claims. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). The Department would "'bear[] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017). Here, nothing would stop the Department from declaring a new shortage of antiviral treatments and instructing health providers to limit access to these treatments on the basis of race. Indeed, the Department emphasizes that "[e]ven though there is not *currently* a shortage of oral antiviral treatments, the pandemic has taught us that supply chain disruptions can happen at any time." Heslin Decl. ¶ 28 (emphasis added); *see also* Opp. 2 (stressing that "the danger" to the public from COVID-19 "is not over"). Because the Department cannot meet its "stringent" and "formidable burden" of showing that it is "absolutely clear" that the Policy is not and will never be in force, Plaintiff's claims are not moot. *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016).

## B.     Plaintiff likely has Article III standing.

The Department argues that Plaintiff lacks standing because he has no "injury in fact." Opp. 11-16. Specifically, the Department claims that Plaintiff has no cognizable injury because (1) the Policy "is not a barrier to Plaintiff's ability to receive antiviral treatments" and (2) Plaintiff hasn't contracted COVID-19 yet and so doesn't need the treatments now. Opp. 11-16. Both arguments fail.[1]

---

[1] The Department misstates Plaintiff's burden on standing. *See* Opp. 12. At the preliminary injunction stage, Plaintiff need only show that "each element of standing is *likely* to obtain in the case at hand." *Speech First v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020) (emphasis added); *Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021) (same). Nor is Plaintiff seeking a "mandatory" injunction. Opp. 10. Plaintiff seeks a prohibitory injunction that "restrains" the Department, not a mandatory injunction that orders it to "take action." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996).

In the context of the Equal Protection Clause, an injury occurs "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Ass. Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Importantly, "a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Id.* The "injury in fact" is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*; *see Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994).

Here, the Policy "makes it more difficult" for non-Hispanic whites "to obtain a benefit"— oral antiviral treatments—"than it is for members of [all other racial and ethnic] group[s]." *City of Jacksonville*, 508 U.S. at 666. As previously explained, "[n]on-whites and Hispanics/Latinos who test positive for COVID-19 automatically qualify for oral antiviral treatments, while identically situated non-Hispanic whites are ineligible unless they demonstrate a 'medical condition' or 'risk factor' that increases their risk for severe illness." Mem. 5. For example, "a healthy 25-year-old African American would be automatically eligible for these treatments while a similarly healthy 62-year-old white person would be ineligible for the treatment." *Id.*

The Department denies none of this. Opp. 11-16. The Department notes that the Policy doesn't "*prevent*[] the Plaintiff" from receiving oral antiviral treatments and the Plaintiff can receive the treatments if he "is *otherwise qualified* based on [his] individual risk factors." Opp. 13 (emphasis added). But whether the Policy gives Plaintiff a different path to obtaining the antiviral treatments is irrelevant. Because the Policy "makes it more difficult" for Plaintiff to obtain these treatments than individuals of other racial and ethnic groups, Plaintiff has a cognizable injury. *City of Jacksonville*, 508 U.S. at 666.

That Plaintiff does not have COVID-19 right now is of no moment. Opp. 15. An injury "need not be actualized" to satisfy Article III. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Plaintiff need only show a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S.

149, 158 (2014). Plaintiff has made that showing. As explained, Plaintiff will almost certainly contract COVID-19 because "'most people are going to get covid.'" Mem. 3 (listing sources). The Department never refutes this. Indeed, the State of New York has repeatedly—and recently—warned of the imminent dangers of COVID-19 to all New Yorkers. *See* Opp. 2-3; *e.g.,* N.Y. Executive Order 11.3, (Feb. 14, 2022), https://on.ny.gov/33DDmZh (declaring a "state disaster emergency" because the "Omicron variant has been shown to be highly transmissible and may cause exponential spread" and "current vaccinations do not appear to be as effective against Omicron infection"). Because Plaintiff has "demonstrate[d] an intent . . . to pursue the benefit" of oral antiviral treatments, he has standing to challenge the Policy's "'barrier that makes it more difficult for [him] to obtain [that benefit].'" *Martinez v. Malloy*, 350 F. Supp. 3d 74, 85 (D. Conn. 2018) (quoting *City of Jacksonville*, 508 U.S. at 666).

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003), is directly on point. There, Michael Baur, a New York resident, challenged a decision from the U.S. Department of Agriculture allowing the use of downed livestock as food for human consumption. Baur alleged that he ate beef products and thus was "injured by the risk that he may consume meat that is the product of a downed animal, and by his apprehension and concern arising from this risk." *Id.* at 630. Agreeing with Baur, the Second Circuit "recognized that threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes." *Id.* at 633. Because downed cattle "may transmit . . . a deadly disease with no known cure or treatment," the Court found that "even a moderate increase in the risk of disease may be sufficient to confer standing." *Id.* at 637. If the rule were otherwise, the government could "completely stop[] enforcing" the consumer-safety laws, and "no consumer would have standing to sue, as it would remain purely speculative that any individual consumer would actually consume contaminated beef and contract [the disease] as a result." *Id.* at 641.

So too here. Because COVID-19 is a "deadly disease," "even a moderate increase in the risk" caused by the Policy is sufficient to confer standing. *Id.* at 637; *see also Reliant Transportation, Inc. v. Div.*

*1181 Amalgamated Transit Union*, 2019 WL 6050345, at *3-4 & n.8 (E.D.N.Y. Nov. 14, 2019) (listing cases). And COVID-19 is obviously far more prevalent than "mad cow" disease. *See Baur*, 352 F.3d at 639 (noting that it was "undisputed that [mad cow disease] has not been detected in the United States despite over ten years of government surveillance"). And if Plaintiff has no standing, the Policy will *never* be subject to judicial review. No individual would ever have time to challenge the Policy because "[t]reatment is most effective when given *as soon as possible* and no more than 5 days after symptom onset," Policy at 3 (emphasis added), and it would obviously be untenable to pursue judicial review in that narrow window. Indeed, under the Department's reasoning, the State could pass a law establishing racial preferences in the provision of all emergency medical care and no New Yorker could challenge the law until he or she actually needed and was denied such care. The Second Circuit has refused to permit these absurd outcomes. *See Baur*, 352 F.3d at 641.

None of the Department's other arguments defeat standing. *See* Opp. 15. The Department speculates that "Plaintiff may or may not be eligible for the [treatments] for reasons unrelated to his race" and "a physician's medical judgment may or may not result in plaintiff receiving the [treatments]." Opp. 15. But, as explained, whether Plaintiff will ultimately receive the treatments is irrelevant because the "injury in fact" is "the denial of equal treatment resulting from the imposition of the barrier." *City of Jacksonville*, 508 U.S. at 666. The Department also claims that "there is no shortage of antiviral therapies such that the [Policy] would be invoked." Opp. 15. But the Department has not withdrawn or modified the Policy, and so the Policy's prioritization rules are still in effect. *Supra* 1. Nor could the Department moot the claim by rescinding the Policy. *Supra* 2.

Finally, the Department ignores the emotional and psychological harms the Policy causes. Not surprisingly, Plaintiff has "a heightened concern when [he] go[es] about [his] daily activities because [he] know[s] that [he is] not automatically eligible for life-saving treatments under [the Policy] solely because of [his] race and ethnicity." Jacobson Decl. ¶ 10. This too is sufficient to show an injury in

5

fact. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2211 (2021) ("[A] plaintiff's knowledge that he or she is exposed to a risk of future physical, monetary, or reputational harm could cause its own current emotional or psychological harm."). Plaintiff likely has Article III standing.[2]

**C.    The Department cannot avoid an injunction by promising not to enforce the Policy.**

The Department contends that injunctive relief is unavailable because the Policy is a "suggestion" and "not a mandate," and the Department "will not take any actions to enforce compliance with it." Opp. 9, 17. But whatever the Department "intended" is irrelevant. Heslin Decl. ¶ 25. The Policy orders providers and facilities to "adhere" to its prioritization criteria and states that antivirals are "authorized" only for those who "meet all the [identified] criteria." Policy at 1-2. *Nowhere* does the Policy state that its criteria are advisory, optional, or "simply a suggestion" to "help focus the thoughts of practitioners." Heslin Decl. ¶ 25.

In any event, courts have long prohibited governments from "suggesting" this type of racial discrimination. For example, in *Baldwin v. Morgan*, 287 F.2d 750 (5th Cir. 1961), a railroad terminal created two waiting rooms, with "signs [that] were posted marking one as the Negro waiting room and the other for whites." *Id.* at 752. The terminal claimed its actions were constitutional because the signs were "merely intended [to be] an invitation to each of the races to occupy these facilities" and the "segregated use or occupancy of such waiting rooms [was not] coercively compelled." *Id.* at 753-54. The Fifth Circuit properly rejected this defense. "What is forbidden is the *state action in which color (i.e., race) is the determinant*," and it is "simply beyond the constitutional competence of the state to command that any facility either shall be labeled as or reserved for the exclusive or preferred use of one rather than the other of the races." *Id.* (emphasis added); *see also Lewis v. Greyhound Corp.*, 199 F. Supp. 210, 214 (M.D. Ala. 1961) (Alabama bus carrier could not "maintain separate facilities in their

---

[2] As the Department concedes, Plaintiff can show causation and redressability because enjoining the Policy would redress the injuries caused by the Policy. *E.g., Vitolo*, 999 F.3d at 359.

terminals for the white and Negro races and [post] signs . . . in the terminals indicating which facilities are for the use of each race," even though the carriers were "not enforcing segregation in the separate facilities which they maintain or utilize."). So too here. The Policy violates the Equal Protection Clause—whether it is a command or merely a "suggestion."

Nor can the Department avoid an injunction by promising not to enforce the Policy. The Department never claims that it lacks the power to enforce the Policy. Opp. 17. Nor would any provider or facility feel free to violate the Policy, especially given its mandatory language. *See* N.Y. Pub. Health Law §12(1)(a) ("[A]ny person who violates, disobeys, or disregards any term . . . of any lawful notice, order, or regulation" issued by the Department of Health is subject to civil penalties); *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013) (courts "presume that the government will enforce the law as long as the relevant statute is recent and not moribund"). If the Department truly will not enforce the Policy (even as it declines to rescind that policy), then the Court should "take [the Department] at [its] word and . . . make official that which [it] ha[s] promised by enjoining [it] from" implementing or enforcing the race-based prioritization criteria. *Jones v. Coleman*, 2017 WL 1397212, at *6 (M.D. Tenn. Apr. 19, 2017). Plaintiff would be protected and the Department would "not be harmed by having to comply with what [it has] effectively agreed to do." *Id.*

### D.      The Policy likely violates the Fourteenth Amendment

The Department contends that the Policy is not subject to strict scrutiny because it "do[es] not 'embody a discriminatory intent.'" Opp. 18 (quoting *Christa McAuliffe v. DeBlasio*, 364 F. Supp. 3d 253, 279-80 (S.D.N.Y. 2019)). That is wrong. The Policy uses explicit racial classifications, *see* Policy at 2, and "*all racial classifications*, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000) (emphasis added); *see Christa McAuliffe*, 364 F. Supp. 3d at 280 ("All racial classifications trigger strict scrutiny" regardless whether "motivated by a racially discriminatory purpose."). The

Department thus must prove that the Policy's racial classifications are "narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005).

The Department argues that it has a compelling interest in "remedy[ing] past discrimination against a class of people." Opp. 18. But "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996). Any interest "in remedying past discrimination" is insufficient unless there are "judicial, legislative, or administrative findings of *constitutional or statutory violations*" and the discrimination was committed by "the governmental unit involved." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492, 498 (1989) (emphasis added); *Vitolo*, 999 F.3d at 361 (same). The Department makes *no attempt* to show that any such violations occurred.

The Department also makes no effort to show that the Policy is narrowly tailored. The Department simply asserts that the Policy is "the narrowest way in which the state can ensure that life-saving therapies be given to those most at risk of severe illness or death." Opp. 19-20. This ipse dixit is woefully insufficient to satisfy "the demanding burden of strict scrutiny." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 303 (2013); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."). Although the Department notes that it need not "'exhaust[] every conceivable race-neutral alternative,'" Opp. 19-20, it cannot identify *even one* race-neutral alternative that it tried before resorting to racial classifications, *see Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 704 (2007) (no narrow tailoring when the government never "considered methods other than explicit racial classifications to achieve [its] stated goals").

The Department contends that "racial and ethnic minority groups [are] more likely" to have "increased severe illness and death from COVID-19." Opp. 6. But as Amici confirm, "race is not an inherent genetic or biological trait and therefore does not *genetically* contribute to a higher risk of medical conditions." Dkt 45-1 at 1. Instead, "[r]ace and ethnicity are *risk markers* for underlying conditions

that affect health, including socioeconomic status, access to health care, and exposure to the virus related to occupation." Heslin Decl. ¶ 21 (emphasis added). Yet the Department requires health care providers to treat individuals as having these "underlying conditions" without examination based on their skin color. There are obvious alternatives to these "offensive and demeaning assumptions," *Miller v. Johnson*, 515 U.S. 900, 912 (1995), including using "risk factors such as advanced age, obesity, a compromised immune system, or other medical conditions." Mem. 1. This Court cannot "'accept as a defense to racial discrimination the very stereotype the law condemns.'" *Miller*, 515 U.S. at 920.

E.     **The Policy likely violates Title VI and the ACA.**

The Department argues that the Policy doesn't violate Title VI or the ACA because the Policy "does not exclude anyone from receiving antiviral therapies on the basis of race" and instead merely "advise[s] health care providers" about antiviral treatments and "clinical considerations." Opp. 21. That is wrong. *Supra* 6. The Department further claims that there is no evidence that the antiviral treatments "at issue in the [Policy] are associated with any federal source of funding." Opp. 21. That too is wrong. *See, e.g.,* Scott Hensley, *First Doses of Paxlovid, Pfizer's New COVID Pill, Are Released to States*, NPR, (Dec. 23, 2021), https://n.pr/3LSDGo0 (noting that "[t]he federal government has a contract for 10 million courses of [Paxlovid] and is providing the medicine free to state and territorial health departments"). Plaintiff is likely to succeed on his claims under Title VI and the ACA.

II.     **Plaintiff satisfies the remaining preliminary-injunction criteria.**

The Department incorrectly argues that only First Amendment violations cause irreparable injury. Opp. 22-23. As this Court recently recognized, "'[i]n the Second Circuit, it is well settled that an alleged constitutional violation constitutes irreparable harm.'" *Barrett v. Maciol*, 2022 WL 130878, at *5 (N.D.N.Y. Jan. 14, 2022) (D'Agostino, J.) (listing cases). "An Equal Protection Clause violation . . . is therefore an irreparable injury." *Id.*; *see also* Mem. 9-10 (listing cases).

Nor are Plaintiff's injuries "tenuous" or "speculative." Opp. 23; *see supra* 2-6. To the contrary, the nature of Plaintiff's injuries underscores his need for a preliminary injunction: When Plaintiff does

contract COVID-19, it will be too late to vindicate his rights because oral antivirals must be administered immediately. *Supra* 5; *see also Malam v. Adduci*, 452 F. Supp. 3d 643, 659 (E.D. Mich. 2020) (finding irreparable injury from the risk of COVID-19 in prison because "[b]y the time a case is confirmed, it will almost certainly be too late to protect [the prisoner's] constitutional rights"). Finally, the purported "lack of a shortage of antiviral therapies" is irrelevant because the Policy is still in effect, and, as the Department acknowledges, a new shortage could occur at any time. *Supra* 1-2.

Finally, the balance of the equities and public interest support a preliminary injunction because it is always in the public interest to prevent the violation of a party's constitutional rights and constitutional alternatives are available. Mem. 11. The Department's only response is that an injunction will impair its interests in "advising health care providers about antiviral therapies" and "reviewing and discussing recommended parameters for use[,] eligibility, and clinical considerations." Opp. 25. But the Department will be free to have these discussions—as long as the Department doesn't use them to implement or enforce the Policy's race-based prioritizations.

## III.   The Department's motion to dismiss should be denied.

The Department's motion to dismiss should be denied because Plaintiff has standing, his claims are not moot, and he has stated claims for relief. *Supra* 1-10. At a minimum, the Department cannot carry its heavy burden at this early stage of the case. *See Fin. Guar. Ins. Co v. Putnam Advisory Co., LLC*, 783 F.3d 395, 401-02 (2d Cir. 2015) ("'At the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury.'"); *Estle v. IBM Corp.*, 23 F.4th 210, 212-13 (2d Cir. 2022) (on a motion to dismiss for failure to state a claim, courts must "'accept the factual allegations as true and draw all reasonable inferences in favor of the plaintiff.'").

## CONCLUSION

The Court should grant the Plaintiff's motion for a preliminary injunction and deny the Plaintiff's motion to dismiss.

Dated:  February 24, 2022                    Respectfully submitted.

                                             */s/  Michael Connolly*

**Gene P. Hamilton***                        **Jonathan F. Mitchell***
Virginia Bar No. 80434                       Texas Bar No. 24075463
Vice-President and General Counsel           Mitchell Law PLLC
America First Legal Foundation               111 Congress Avenue, Suite 400
300 Independence Avenue SE                   Austin, Texas 78701
Washington, DC 20003                         (512) 686-3940 (phone)
(202) 964-3721                               (512) 686-3941 (fax)
gene.hamilton@aflegal.org                    jonathan@mitchell.law


**Adam K. Mortara***                         **Jeffrey Harris***
Illinois Bar No. 6282005                     **Michael Connolly***
Lawfair LLC                                  **James Hasson***
125 South Wacker Drive Suite 300             Consovoy McCarthy PLLC
Chicago, Illinois 60606                      1600 Wilson Boulevard, Suite 700
(773) 750-7154                               (703) 243-9423
adam@mortaralaw.com                          jeff@consovoymccarthy.com
                                             mike@consovoymccarthy.com
**James P. Trainor**                         james@consovoymccarthy.com
New York Bar No. 505767
Trainor Law PLLC
2452 U.S. Route 9                            *\* admitted pro hac vice*
Malta, New York 12020
518-899-9200 (phone)
jamest@trainor-lawfirm.com                   *Counsel for Plaintiff and the Proposed Class*

**CERTIFICATE OF SERVICE**

I certify that on February 24, 2022, I electronically filed the foregoing with the Clerk of Court

using the CM/ECF System, which will automatically send e-mail notification to all counsel of record.


*/s/ Michael Connolly*